**FILED**

**FEBRUARY 1, 2008**
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

**08 C 729**

|  |  |
|---|---|
| SHIMERA JONES, DAISY ALVAREZ & RUBEN ALVAREZ, on behalf of themselves and all others similarly situated,<br><br>      Plaintiffs,<br><br>v.<br><br>WASHINGTON MUTUAL, INC. and DOES 1-10, inclusive;<br><br>      Defendants. | CASE NO.: |

**JUDGE KOCORAS**
**MAGISTRATE JUDGE BROWN**

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

**CLASS ACTION COMPLAINT**

Plaintiffs Shimera Jones, Daisy Alvarez and Ruben Alvarez ("Plaintiffs"), on behalf themselves and a class of all others similarly situated, allege as follows:

**INTRODUCTION**

1. Defendants Washington Mutual, Inc. ("Washington Mutual" or the "Company"), among the nation's largest mortgage lenders, has demonstrated an established pattern and practice of racial discrimination in the financing of residential home purchases. Through these actions, Defendant has violated the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, the Equal Credit Opportunity Act, 15 U.S.C. § 1691, *et seq.*, the Civil Rights Act, 42 U.S.C. §§ 1981, 1982 *et seq.* and common law.

2. This is a proposed national class action brought by Plaintiffs on behalf of themselves and a class of all other similarly situated Minority (defined below) homeowners subjected to Defendants' discriminatory practices in obtaining their residential mortgage loans

(hereinafter referred to as the "Class" or "Class Members"). Plaintiffs seeks relief for herself and all other members of the Class from the indefensible injustice resulting from Defendant's unlawful business practices.

3.      For purposes of this Complaint, "Minority" or "Minorities" shall refer to any and all non-Caucasian/White racial groups protected under the Equal Credit Opportunity Act, the Fair Housing Act and the Civil Rights Act, including, without limitation, African-Americans and Latinos. Additionally, for the purposes of this Complaint, "mortgage" refers to any loan made for the purpose of purchasing, constructing, improving, repairing or maintaining a dwelling, or a loan secured by residential real estate.

4.      The mortgage lending industry has a long history of racial discrimination, offering Minorities products and terms that are drastically worse than those given to their similarly-situated Caucasian counterparts. Recently, the Federal Reserve Board confirmed that African-Americans and other Minorities are still more likely to pay higher prices for mortgages than Caucasians.

5.      According to the Federal Reserve Board's Survey of Consumer Finances, a triennial survey of the balance sheet, pension, income, and other demographic characteristics of U.S. families, 47% of African-Americans and Latinos are homeowners, compared with 74% of Caucasians.

6.      In 2003, the National Community Reinvestment Coalition ("NCRC") released a report on credit discrimination titled, "The Broken System: Discrimination and Unequal Access to Affordable Loans by Race and Age,"[1] that indicated that consumers living in areas with more

---

[1] This report is available at http://ncrc.org/policy/cra/documents/ncrcdiscrimstudy.pdf/.

Minority residents are more likely to have mortgages with interest rates higher than the "prevailing and competitive" rates, often because of discrimination in lending.

7.    Home Mortgage Disclosure Act ("HMDA") Data for 2006 revealed that African-American and Latino borrowers are more likely to obtain higher priced loans than are Caucasian borrowers.[2]  The data indicated that African-American homeowners who received sub-prime mortgage loans were much more likely to be issued a higher-rate loan than Caucasian borrowers with the same qualifications.

8.    In a speech last year, Martin J. Gruenberg, Vice Chairman of the Federal Deposit Insurance Corporation discussed that "previous studies have suggested higher-priced, subprime lenders are more active in lower income, urban areas and that minority access to credit is dominated by higher cost lenders."[3]

9.    In 2006, the Center for Responsible Lending, a non-profit research organization, uncovered "large and statistically significant" differences between the rates of sub-prime loans offered to African-Americans and Caucasians, even when income and credit risk were taken into consideration.  Compared to their otherwise similarly-situated Caucasian counterparts, African-Americans were 31-34% more likely to receive higher rate fixed-rate loans and 6-15% more likely to receive adjustable-rate loans.  Those numbers were even higher for loans containing prepayment penalties, which accounted for over 60% of the loans issued to African-American mortgagees.[4]

---

[2] This report is available at www.ffiec.gov/hmda/.

[3] *See* "Remarks of Martin J. Gruenberg, Vice Chairman, FDIC; Inter-American Development Bank", October 18, 2006, available at Http://www.fdic.gov/new/speeches/archives/2006/chairman/spoct1806.html.

[4] *See* "Unfair Lending:  The Effect of Race and Ethnicity on the Price of Subprime Mortgages," available at www.responsiblelending.org.

10.    Findings in a study released by the NCRC in July 2007[5] confirm that institutions in at least six urban areas engaged in "pervasive discriminatory and predatory practices." Such practices include offering high cost sub-prime loans to higher-qualified African-Americans 54% of the time, compared to 23% of the time for Caucasians, even when Caucasian applicants were similarly or less qualified.

11.    Sub-prime loans to African-Americans and other Minorities not only impose higher interest rates, they are typically laden with excessive, unreasonable and often improperly disclosed fees as well. Such fees include high prepayment penalties which make it impossible for borrowers to later refinance at a competitive and fairer rate. The Center for Responsible Lending estimates that families lose $2.3 billion each year from their home equity wealth because of prepayment penalties in sub-prime mortgage loans—representing a transfer of wealth from working families to large, institutional lenders. African-Americans are more than three times as likely as Caucasians to be put into one of these equity-draining sub-prime loans. (*See* n. 3).

12.    Washington Mutual operates through a number of subsidiaries and/or trade names, including, without limitation, Washington Mutual Bank, Washington Mutual Bank fsb and Long Beach Mortgage Co. Washington Mutual was recently examined in a study conducted by the California Reinvestment Coalition, Community Reinvestment Association of North Carolina, Empire Justice Center, Massachusetts Affordable Housing Alliance, Neighborhood Economic Development Advocacy Project, and the Woodstock Institute in March of 2007 ("2007 Joint Report").[6] The study discussed higher cost home purchase lending in six metropolitan areas (Boston, Charlotte, Chicago, Los Angeles, New York City and Rochester)

---

[5] "Income is no Shield Against Racial Differences in Lending," available at http://ncrc.org.

during 2005 and found significant disparities between loans made to Minority and Caucasian borrowers.

13.    The 2007 Joint Report included a specific case study of Washington Mutual's lending activities through Long Beach Mortgage Co.  According to this study, the use of different lending channels, whereby a corporation offers prime mortgage loans under one name in some locations, and offers higher-cost subprime loans under a different name in other locations, enables the corporation to target minority neighborhoods with higher-cost subprime loan products.  The case study of Washington Mutual's lending activities found that Long Beach Mortgage Co.'s higher-cost subprime loans are heavily targeted to Minority borrowers.

14.    The Federal Reserve has also noted that borrowers of color are more likely to obtain their loans from higher-cost subprime lenders.

15.    These significant disparities are not mere coincidences.  They are the result of a systematic and predatory policy of targeting Minority borrowers for high cost loans.  Defendants' business practices include implementing and maintaining policies that discriminate against Minorities.  Plaintiffs bring this lawsuit to seek relief from the harms suffered as a result of Defendants' practices and to enjoin Defendants from continuing its discriminatory practices.

## THE PARTIES

**Plaintiffs**

Shimera Jones

16.    Plaintiff Shimera Jones has been harmed by Defendants' unlawful conduct.

17.    Ms. Jones, a resident of Chicago, Illinois, is a gainfully employed Minority homeowner.  On December 22, 2005, Ms. Jones purchased a residence located at 5307 S.

---

[6] *See* "Paying More for the American Dream:  A Multi-State Analysis of Higher Cost Home Purchase Lending," available at www.woodstockinst.org.

Emerald Avenue, Chicago, Illinois. The purchase was financed by Washington Mutual. Her lender was listed as "Long Beach Mortgage Company;" however, her loan was simultaneously transferred to "Washington Mutual Bank, FA" for servicing. By operation of law, Washington Mutual Bank is the successor-in-interest to Long Beach Mortgage Company.

18.    At the time of her loan, Ms. Jones was gainfully employed, had substantial assets and a credit score of 642. Ms. Jones was placed into an 80/20 loan program with one adjustable-rate mortgage loan with an initial rate of 10% and a second mortgage loan with a fixed rate of 11.7%.

19.    Prior to closing, Ms. Jones was told that her interest rate would be 6%. At closing, however, she was told for the first time that she would have two loans and that her interest rates would be 10% and 11%, as described above.

20.    Ms. Jones exercised due diligence and inquired as to the reason that she was being charged such a high interest rate. In response, she was told that the rates "had changed" and that these terms were the best that Washington Mutual would offer her.

21.    Further, unbeknownst to Ms. Jones, the information on her loan application was falsified to indicate assets that she did not actually have. The application listed, for instance, that Ms. Jones had $300,000 in total assets and a personal net worth of $259,346—which was simply untrue. The falsified assets included a listing of "personal property" worth $75,000, a bank account with a balance of $40,000 and real estate valued at $185,000. The property that Ms. Jones intended to purchase with the mortgage loan was valued at $185,000. Thus, upon information and belief, unbeknownst to Ms. Jones, her loan application was falsified by including among her assets the full value of the home that she had yet to purchase. Additionally, the loan application was falsified with incorrect information concerning her employer.

22.     Exercising due diligence, at closing, Ms. Jones informed her broker that this information was false. In response, she was told that the false information was merely the result of typographical errors that would be corrected and that she should not "worry about it."

23.     Ms. Jones was charged numerous fees in connection with her closing, including, without limitation, a $250 "doc prep fee" and a $549 underwriting fee to "Long Beach Mortgage Co., LLC" and an appraisal fee of $675.

24.     Ms. Jones is still unaware of the true costs and terms of her loan. At closing, Ms. Jones was not provided with a complete copy of her loan documents. For instance, upon information and belief, Ms. Jones was provided with only the first page of her Adjustable Rate Note; she was not provided with the second and third page of the note. Thus, she is unaware of the true terms of her loan, including, without limitation, whether the note contains a prepayment penalty.

25.     Ms. Jones is now trapped in a high cost loan.

Daisy and Ruben Alvarez

26.     Plaintiffs Daisy and Ruben Alvarez have been harmed by Defendants' unlawful conduct.

27.     Mr. and Mrs. Alvarez, residents of Chicago, Illinois, are gainfully employed Minority homeowners. On September 29, 2006, they purchased a residence located at 5132 W. Bloomingdale Ave., Chicago, Illinois. The purchase was financed by Washington Mutual. The lender was listed as "Long Beach Mortgage Company;" however, at closing, Mr. and Mrs. Alvarez were provided with a disclosure form stating that the actual lender was Washington Mutual Bank, the successor-in-interest to Long Beach Mortgage Company, by operation of law.

28.    At the time of their Mr. and Mrs. Alvarez were gainfully employed, had personal assets and, to their recollection, had a credit scores in the mid 600s. The loan provided by Washington Mutual was an 80/20 loan program with one adjustable-rate mortgage loan with an initial rate of 7.625% and a second mortgage loan with a fixed rate of 11.25%.

29.    Mr. and Mrs. Alvarez exercised due diligence; however, the interest rate on the loan was changed by a Washington Mutual representative prior to closing.

30.    Mr. and Mrs. Alvarez are now trapped in a high cost loan.

**Defendant**

31.    Defendant Washington Mutual, Inc. is a corporation organized under the laws of the State of Washington with its principal place of business in Seattle, Washington. It operates as a savings and loan holding company. Washington Mutual operates its banking business through subsidiaries Washington Mutual Bank and Washington Mutual Bank fsb, both of which are federal savings banks organized under the laws of the United States. According to Exhibit 21 to Washington Mutual's latest Form 10-K filing with the Securities and Exchange Commission, Washington Mutual Bank does business as "Washington Mutual Bank," "Washington Mutual Bank, FA," "Long Beach Mortgage Company" and as "Long Beach Mortgage."

32.    Plaintiffs are unaware of the names and capacities of those defendants sued as DOES 1 through 10, but will seek leave to amend this complaint once their identities become known to Plaintiffs. Upon information and belief, Plaintiffs allege that at all relevant times each defendant, including the DOE defendants 1 through 10, was the officer, director, employee, agent, representative, alter ego, or co-conspirator of each of the other defendants, and in engaging in the conduct alleged herein, which was in the course and scope of and in furtherance

of such relationship.  Unless otherwise specified, Plaintiffs will refer to all defendants, including the Company, collectively as "Defendants" and each allegation pertains to each Defendant.

## JURISDICTION AND VENUE

33.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343. This is an action for violation of the Fair Housing Act, 42 U.S.C. §3601 *et seq*., the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq*., and the Civil Rights Act, 42 U.S.C. § 1981 *et seq*.

34.     Venue is proper in this district under 28 U.S.C. § 1391 because Defendants reside in this district, within the meaning of 28 U.S.C. § 1391(c) and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred, or a substantial part of property that is the subject of this action is situated, in this district.

## CLASS ACTION ALLEGATIONS

35.     Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2) and/or 23(b)(3) on behalf of the following (the "Class"):

> All Minority persons in the United States who obtained a residential mortgage loan from Washington Mutual between January 1, 2001 and the present and were harmed by Defendants' racially discriminatory policies and/or practices.

36.     The Class is so numerous that joinder of all members is impracticable.

37.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

38.     Plaintiffs' claims are typical of the claims of the Class.  Plaintiffs and the Class were harmed by the same course of conduct and seek recovery under the same legal theories.

39.     There are questions of law and fact common to the Class, including but not limited to:

a)      Whether Defendants have a policy or practice of discriminating against Class Members by charging them higher interest, fees and other costs for home mortgage loans than it charges to Caucasians with similar credit scores or creditworthiness;

b)      Whether Defendants have policies or practices that have had a disparate impact upon Minority borrowers

c)      Whether Defendants' policies and practices have caused damage and injury to Plaintiffs and the Class entitling them to injunctive and declaratory relief, and the measure of that relief;

d)      Whether Defendants can articulate a legitimate non-discriminatory reason for their practices and procedures which are discriminatory;

e)      Whether Defendants have any business justification for their practices and procedures that cause a disparate impact upon Minorities;

f)      Whether there is a less discriminatory alternative to these practices;

g)      Whether Plaintiffs and Class Members have sustained damages, and, if so, the proper measure of those damages.

40.      These and other questions of law and/or fact are common to the Class and predominate over any questions affecting only individual Class Members.

41.      Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiffs have retained counsel competent and experienced in complex nationwide class action litigation. Plaintiffs have no claims antagonistic to those of the Class. Plaintiffs' counsel will fairly, adequately and vigorously protect the interests of the Class.

42.      Class action status is warranted under Rule 23(b)(1)(A) because the prosecution of separate actions by or against individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant.

43.      Class action status is also warranted under Rule 23(b)(1)(B) because the prosecution of separate actions by individual Class Members would create a risk of adjudications

with respect to individual Class Members which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

44.    Class action status is also warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

45.    Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the Class Members predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## FRAUDULENT CONCEALMENT/EQUITABLE TOLLING

46.    Applicable statutes of limitation may be tolled based upon principles of equitable tolling, fraudulent concealment and/or the discovery rule.  In this case, it would be inequitable to permit the applicable statutes of limitation to bar the claims of any absent Class Member.

47.    First, Defendants knowingly and actively concealed the basis for the Plaintiffs' claims by engaging in a scheme that was, by its very nature and purposeful design, self-concealing.  Not only did Defendants fail to disclose their discriminatory practices/policies and procedures that had a disparate impact upon Minority borrowers, but they took affirmative steps to conceal them.

48.    As one of the largest mortgage lenders in the United States, Washington Mutual knew or should have known that its policies and procedures, including, without limitation, their credit pricing system and the manner in which they train and incentivize their employees/agents

causes Minorities to pay higher amounts for mortgage financing than similarly-situated Caucasian customers.

49.    Defendants affirmatively and intentionally concealed their discriminatory practices.  The Companies spent millions of dollars annually on advertising and marketing, intentionally targeting Minority borrowers with false and misleading information.  These materials were designed to create and foster the image that Defendants offer all Minority borrowers competitive, low-cost residential mortgage loans that are objectively set.  Upon information and belief, Defendants also affirmatively concealed disproportionately high loan costs and fees, such as large prepayment penalties, the interest rate increases and prepayment penalties, add-on fees, unjustified interest rate hikes, etc.  Defendants never disclosed and affirmatively concealed the truth concerning the fact that: (a) their credit rates are subjective and can vary significantly among persons with substantially similar or identical credit profiles, and (b) they have authorized and provided a financial incentive to mortgage brokers to subjectively increase the credit rate above the rate otherwise available to homeowners, as well as increase other finance charges.

50.    Second, any delay by the Class Members is clearly excusable.  In addition to the reasons stated above, as a practical matter, victims of lending discrimination may not even realize that they received disparate terms until—if ever—years after the loan closes.  Here, the Class Members could not, despite the exercise of due diligence, have discovered the underlying basis for their claims.  For these reasons, any delay by the Class Members whose claims accrued outside of any applicable statutes of limitation was excusable.  Thus, to the extent that any applicable statute of limitations would bar the claim of any absent Class Members, such statute should be equitably tolled.

51.    Accordingly, Plaintiffs respectfully submit that it would be inequitable to permit the applicable limitation periods to preclude the claim of any Plaintiff or member of the proposed Class, as doing so would, essentially reward Defendants for concealing its unlawful conduct.

## FACTUAL ALLEGATIONS

52.    Washington Mutual conducts business through four primary business lines: Retail Banking & Financial Services, Home Loans, Commercial Banking, and Card Services.  It owns two banking subsidiaries as well as numerous non-bank subsidiaries.

53.    As of December 31, 2006, Washington Mutual had 49,824 employees, and is ranked as one of the nation's leading financial services companies.

54.    The Company's primary banking subsidiaries are Washington Mutual Bank and Washington Mutual Bank fsb.

55.    Long Beach Mortgage Company, which Washington Mutual purchased in 1999, is among the nation's top 10 wholesale sub-prime lenders, having originated nearly $30 billion in mortgage loans in 2005.

56.    Owning a home is fundamental for one's economic security and the chief means by which families build wealth.  Home equity accounts for more than one-third of the average net wealth of U.S. households.  Studies demonstrate that this percentage is even greater for Minorities.

57.    During the last decade, Minorities have been purchasing record numbers of homes, leading to a multi-year housing boom.  They account for 49% of the increase in home ownership from 1995 to 2005, according to Harvard University's Joint Center for Housing

Studies.[7]  Nonetheless, Minority home ownership is marred by sub-prime loans, excess fees and higher costs than their Caucasian counterparts.

58.    Sub-prime loans are higher-cost mortgage products that are in theory given to borrowers who are undesirable loan candidates.   In the last decade, an entire sub-prime industry has grown out of the greater profits generated by the higher rates and exorbitant fees charged to these "high-risk" borrowers.   This industry has inappropriately and unlawfully maximized its profits by directing borrowers with relatively good credit to sub-prime mortgages, especially Minority borrowers.

59.    In a recent study released on September 5, 2007, the Association of Community Organizations for Reform Now ("ACORN"), one of the nation's largest community organizations of low- and moderate-income families, found that, nationally, African-American home purchasers were **2.7 times more likely** and Latinos were **2.3 times more likely** than Caucasian borrowers to be issued a problematic, subprime loan.   Additionally, the ACORN study, available at www.acorn.org, found that nationally, for refinance loans, African-Americans were **1.8 times more likely** and Latinos were **1.4 times more likely** than Caucasian borrowers to be issued a problematic, subprime loan.

60.    Differences in economic status are not to blame.   These racial disparities were found to persist even among borrowers of the same income level.   The ACORN study found that, among upper-income home purchasers (defined as persons with incomes 120% or greater than the area median income for their metropolitan area), African-Americans  were **3.3 times more likely** and Latinos were **3 times more likely** than similarly-situated Caucasians to be issued a high-cost, subprime loan.   Further, the ACORN study found that, with respect to refinance loans,

---

[7] Available at www.jchs.harvard.edu/son/index.htm.

among upper-income borrowers, African-Americans and Latinos were **1.7 times more likely** than similarly-situated Caucasians to be issued a high-cost, subprime loan.

61.     While some borrowers in the sub-prime market are genuine credit risks, Minority borrowers have been preyed upon by mortgage lenders and illegally steered into sub-prime loans. Defendants have engaged in this predatory lending by refusing to offer Minority borrowers the prime loans offered to similarly-qualified Caucasian borrowers.

62.     Studies by Freddie Mac and Standard & Poor's have found that 20% to 30% of borrowers who receive sub-prime mortgages could have qualified for traditional mortgages at the lower rates offered by banks to prime borrowers.  This seriously disadvantages the borrower by effectively diluting the equity of the property, placing the borrower in jeopardy of default, and forcing the borrower to spend years paying off additional loan balances without developing any equity in their home.

63.     Further, the U.S. Department of Housing and Urban Development found that in neighborhoods where at least 80 percent of the population is African-American, borrowers were 2.2 times as likely as borrowers in the nation as a whole to refinance with a sub-prime lender. Higher-income borrowers living in predominately African-American neighborhoods are twice as likely as lower-income Caucasian borrowers to have sub-prime loans.[8]

64.     The predatory lending practices of the Defendants and other mortgage lenders lead to dire financial consequences for borrowers.  Earlier this year, over eighty consumer groups wrote to federal banking agencies about a particular type of sub-prime loan, the adjustable rate mortgage (ARM).  An ARM typically contains an average built-in "shock payment" increase of 29%, even if interest rates remain unchanged. Fitch Ratings reports that the actual payment

---

[8] *See* "All Other Things Being Equal:  A Paired Testing Study of Mortgage Lending Institutions," 2002, available at www.huduser.org.

shock may be as high as 48%. The majority of sub-prime loans made to Minorities had these adjustable rates.  The Center for Responsible Lending estimates that 2.2 million such sub-prime loans have ended or will end in foreclosure, a rate of 19%.

65.    The Center for Responsible Lending published a study in December 2006 on the effects of foreclosure.[9]  The report states that the costs of sub-prime foreclosures fall heavily on African-American and Latino homeowners, since sub-prime mortgages are disproportionately made in communities of color.  HMDA data shows that over half of loans to African- American borrowers are higher-cost loans, which, by definition, are a proxy for sub-prime loans.  For Latino homeowners, the portion of higher-cost loans is also very high, at four in ten. This data implies that sub-prime foreclosures will affect eight percent of recent Latino borrowers and 10 percent of recent African-American borrowers.  By comparison, sub-prime foreclosures will likely occur among only about four percent of recent Caucasian borrowers.

66.    The Center for Responsible Lending released an additional study in November, 2007[10] that explains how when a home goes into foreclosure, the negative effects extend beyond individual families losing their homes to surrounding neighbors and the wider community.  The 2007 study further reports that a foreclosure on a home lowered the price of other nearby single-family homes, on average, by .9 percent.  That impact was even higher in lower-income neighborhoods, where each foreclosure dropped home values by an average of 1.44 percent.  The study notes that communities of color will be especially harmed, since these communities receive a disproportionate share of sub-prime home loans.

---

[9] *See* "Losing Ground: Foreclosures in the Subprime Market and Their Cost to Homeowners." December 2006, available at www.responsiblelending.org.
[10] *See* "Subprime Spillover: Foreclosures Cost Neighbors $223 Billion; 44.5 Million Homes Lost $5,000 on Average." Center for Responsible Lending, available at www.responsiblelending.org.

67.    The 2007 study projects that, nationally, foreclosures on subprime home loans originated in 2005 and 2006 will have numerous impacts on the neighborhoods and communities in which they occur.  For instance, the study predicts that 44.5 million neighboring homes will experience devaluation because of subprime foreclosures that take place nearby and the total decline in house values and tax base from nearby foreclosure will be about $223 billion. Homeowners living near foreclosed properties will see their property values decrease $5,000 on average. (*see* n. 9)

68.    In a 2005 working paper by Stephen L. Ross of the University of Connecticut, he comments that "abusive features in predatory loans, such as high income ratios and repeated refinancing of the same mortgage, is likely to exacerbate foreclosure rates in minority and low-income neighborhoods where sub-prime lending tends to be concentrated."[11]

69.    Defendant Washington Mutual originates and funds mortgage loans through loan officers, brokers and through a network of correspondent lenders.  Its website represents that "Washington Mutual's Home Loans segment is a leader in the mortgage industry in mortgage origination, sales and servicing. The segment offers a broad array of home lending products through its retail, wholesale, correspondent and sales channels." (http://www.wamu.com/about/corporateprofile/whatwedo/default.asp (last viewed February 1, 2008).)

70.    On information and belief, the loan officers, mortgage brokers and correspondent lenders that work with Defendants broker and fund loans in collaboration with Defendants and in conformance with Defendants' credit-pricing policies and procedures.

---

[11] *See* "The Continuing Practice and Impact of Discrimination." University of Connecticut. June, 2005, available at http://repec.org/.

71.  Defendants have followed -- and continue to follow -- discretionary loan pricing procedures that cause minority borrowers to pay subjective fees such as yield spread premiums and other mortgage related finance charges at higher rates than similarly situated non-minority borrowers.  Defendants have intentionally discriminated against Plaintiffs and Class Members through these policies and procedures -- systematically giving them mortgage loans with less favorable conditions than were given to similarly situated non-minority borrowers.  This pattern of discrimination is not the result of random or non-discriminatory factors.  Rather, it is a direct result of Defendants' mortgage lending policies and procedures.

72.  On information and belief, Defendants' authorized loan officers, mortgage brokers and correspondent lenders receive part of all of their compensation from Defendants based on the interest rate charged to the borrower.  Defendants' in-house loan officers, authorized brokers and correspondent lenders receive more compensation from Defendants when they steer their clients into Washington Mutual/Long Beach loans with higher interest rates, and less compensation when they place their clients into Washington Mutual/Long Beach loans with lower interest rates.

73.  Defendants' conduct intentionally and actively implements this discriminatory credit-pricing policy in a number of ways, including actively educating its loan officers and brokers about Defendants' credit policies and procedures, and directing its loan officers and brokers regarding the marketing of Defendants' loan products.

74.  These credit-pricing policies and procedures permit Defendants' authorized loan officers, mortgage brokers and correspondent lenders subjectively to charge certain loan applicants yield spread premiums and other discretionary charges, including minority loan applicants.

75.    This pattern of discrimination cannot be justified by business necessity, and could be avoided through the use of alternative policies and procedures that have less discriminatory impact and no less business efficacy.

76.    Defendants discriminate through their authorized mortgage brokers.  Authorized mortgage brokers act as Defendants' agents in originating mortgage loans.  Authorized mortgage brokers enter into agreements with Defendants to accept loan applications on behalf of Defendants; communicate to loan applicants financing terms and rates set by Defendants; tell loan applicants about Defendants' various financing options; and ultimately originate mortgage loans funded by Defendants using Defendants' forms and in accordance with Defendants' policies and procedures.

77.    Harvard University's Joint Center for Housing Studies found that a higher share of broker-originated loans go to African American borrowers (64 percent) than to Caucasian borrowers (38 percent).[12]   A large share of borrowers with these broker-originated loans count on lenders or brokers to find the best mortgage, however these borrowers are more likely to pay points (25 percent compared with 15 percent for lender-originated loans) and more likely to have a loan with a prepayment penalty (26 percent, compared with 12 percent for lender-originated loans.) According to the study, these findings imply that some brokers actively work to identify borrowers who lack the experience to correctly evaluate mortgage terms and prices.

78.    In addition to brokers, Defendants' authorized correspondent lenders and loan officers also act as Defendants' agents in originating loans.  Correspondent mortgage lenders and loan officers that work with Defendants make loans in accordance with Defendants' credit

---

[12] *See* "The Dual Mortgage Market: The Persistence of Discrimination in Mortgage Lending." December 2005. W05-11. Available: http://www.jchs.harvard.edu/publications/finance/w05-11.pdf

policies and procedures.  Defendants fund correspondent-generated loans before or shortly after they go to closing.

79.  Defendants, then, fund loans originated by its loan officers, authorized mortgage brokers and correspondent lenders, sets the terms and conditions of credit on those loans, and shoulders part of all of the risk on such loans.  Defendants actively and intentionally enforce their credit policies through their authorized loan officers, mortgage brokers and correspondent lenders in a variety of ways.  Among other things, Defendants supply their loan officers, correspondent lenders and mortgage brokers with an array of loan-related forms and agreements, including loan contracts, loan applications, and instructions on completing loan applications and contracts.  And, as previously noted, Defendants actively train their authorized brokers to follow Defendants' policies and procedures, and reinforce that training with marketing support.

80.  Once a loan applicant has provided credit information to Defendants through a loan officer, mortgage broker or correspondent lender, Defendants perform an initial objective credit analysis.  At that point, Defendants evaluate numerous risk-related credit variables, including debt-to-income ratios, loan-to-value ratios, credit bureau histories, debt ratios, bankruptcies, automobile repossessions, prior foreclosures, payment histories, credit scores, and the like.

81.  Defendants derive a risk-based financing rate from these objective factors, which Defendants and others in the mortgage industry simply call the "par rate." (Defendants' brokers and correspondent lenders can also estimate the par rates by referring to an applicant's credit bureau-determined credit score.)

82.  Although Defendants' initial analysis applies objective criteria to calculate this risk-related interest rate, Defendants, as a matter of policy and procedure, authorize their loan

officers, brokers and correspondent lenders to mark up that rate later, and also impose additional non-risk-based charges including yield spread premiums, and other discretionary fees. Defendants regularly communicate applicable par rates, authorized yield spread premiums, and other discretionary fees to their loan officers, brokers and correspondent lenders via "rate sheets" and other communications.

83.    Defendants' policy is to give their loan officers, authorized mortgage brokers and correspondent lenders discretion to impose yield spread premiums and other subjective fees on borrowers.  When borrowers pay yield spread premiums, Defendants share in additional income generated by the premium because the yield spread premium-affected borrower is locked into a higher interest rate going forward on their Washington Mutual/Long Beach loan than they would be if they had been placed in a par rate loan without a yield spread premium.

84.  Defendants' borrowers pay yield spread premiums and other discretionary fees that inflate their finance charges not knowing that a portion of their finance charges are non-risk-related.  In essence, yield-spread premiums are a bonus paid to brokers for placing borrowers in a loan with a higher interest rate.  In a speech by Keith Ernst of the Center for Responsible Lending in June 2006, this presents a "reverse competition" problem, since it provides an incentive for brokers to deliver loans with higher rates to borrowers.[13]

85.    Defendants' policies and procedures concerning the assessment of yield spread premiums and other discretionary fees cause persons with identical or similar credit scores to pay differing amounts for obtaining credit.  Such subjective loan pricing -- which by design imposes differing finance charges on persons with the same or similar credit profiles -- disparately impacts Defendants' Minority borrowers.

---

[13] *See* "Testimony of Keith Ernst, Senior Policy Counsel, Presented to the Subcommittee on Financial Institutions and Consumer Credit." June 13, 2006. Available: http://www.responsiblelending.org/

86.     While Defendants' use of a common credit policy for all loan applicants might appear to be racially neutral, Defendants' use of yield spread premiums and other discretionary fees disproportionately and adversely affects Minorities (relative to similarly situated non-minorities).  Defendants' credit policy causes Minorities to pay disparately more discretionary finance charges than similarly situated non-minorities.  As the HMDA data cited herein indicates, Minorities are substantially more likely than similarly situated non-minorities to pay such charges.

87.     Defendants' credit policy is in fact intentionally discriminatory.  As described above, Defendants' credit pricing policy by design discriminates against Minority borrowers and directly causes this disparate impact.

88.     As previously stated, Washington Mutual owns and operates through Long Beach Mortgage Company.  Both Defendant Washington Mutual and Long Beach Mortgage Company were studied in the 2007 Joint Report (*see* n. 5) which examined higher cost home purchase lending.  The Report includes a Case Study of Defendant Washington Mutual and reports that the use of different lending channels, whereby a corporation offers prime direct under one name in some locations, and offers higher-cost subprime credit under a different name in other locations, enables the corporation to target minority neighborhoods with higher-cost subprime loan products.  The Federal Reserve has noted that Minorities are more likely to obtain their loans from higher-cost subprime lenders.

89.     The 2007 Joint Report further indicates that lending patterns within Defendant Washington Mutual indicate that higher-cost subprime mortgages are heavily targeted to Minority borrowers through their Long Beach Mortgage Company.  In the six cities surveyed in the study (New York City, Los Angeles, Chicago, Boston, Charlotte, and Rochester), Long

Beach Mortgage Company was Defendant Washington Mutual's main lender and accounted for 75.9% of all Defendant Washington Mutual home purchase loans to African-Americans, and 64.7% of all Defendant Washington Mutual's home purchase loans to Latinos in 2005. (*See chart from Joint Report below*):

**Percent of Washington Mutual Home Purchase Loans Originated by Long Beach Mortgage by Race/Ethnicity and Metropolitan Area, 2005**



90.    The Joint Report notes that in Boston, Charlotte, and Chicago, 80% or more of the Washington Mutual home purchase loans to African-American or Latino borrowers were through Long Beach.

91.    In contrast, the 2007 Joint Report found that Defendant Washington Mutual's lower-cost prime lender, Defendant Washington Mutual Bank, accounted for more than 80% of all Defendant Washington Mutual's home purchase loans to Caucasians during that year.

92.     In almost all of the markets analyzed in the 2007 Joint Report, over 90% of the home purchase loans originated by Defendant Long Beach Mortgage were higher cost, and less than one percent of the mortgages originated by Defendant Washington Mutual Bank were higher-cost. African-American and Latino borrowers utilized Defendant Long Beach Mortgage far more frequently than did Caucasian borrowers.

93.     While long suspected, this discrimination has only recently been disclosed and quantified. It has only been in the last few years that mortgage lenders have been required to submit details of their sub-prime home loans under the Home Mortgage Disclosure Act. The groups that have studied predatory lending and the mortgage market have uncovered incredible racial disparities in the types of mortgages offered.

94.     By placing Minority mortgagors into higher-priced sub-prime loans because of their race, Defendants violate the Fair Housing Act, the Equal Credit Opportunity Act, and the Civil Rights Act. These violations entitle the Plaintiffs and Class Members to the declaratory and injunctive relief provided under the Acts.

## COUNT I:
### VIOLATIONS OF THE FAIR HOUSING ACT
### (42 U.S.C. §3601 et seq.)

95.     Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

96.     Plaintiffs and the putative class members are members of a protected class under the Fair Housing Act.

97.     Plaintiffs were qualified to receive a loan with more favorable credit terms and associated costs. Yet Defendants issued them a loan with terms less favorable and with higher associated costs, despite their qualifications, while Defendants offered loans with more favorable

terms and lower associated costs to non-Minorities with the same or similar qualifications as Plaintiffs.

98.     The Fair Housing Act was enacted in 1968 to prohibit discrimination in connection with real estate transactions such as purchasing and refinancing a home. The Fair Housing Act has been broadly construed by the courts to protect consumers.

99.     The Fair Housing Act prohibits mortgage lenders from imposing different terms or conditions on a loan on the basis of race. Defendants targeted Minorities for higher cost sub-prime mortgage loans, while directing similarly-qualified Caucasian applicants into lower cost loans.

100.     Defendants engaged in residential real estate-related transactions with respect to the Plaintiffs and all prospective Class Members.

101.     Defendants' discretionary pricing policies have resulted in discrimination with respect to the Plaintiffs and all prospective members of the Class.

102.     As a result of Defendants' discretionary pricing policies, Defendants have collected more in finance charges from Minorities than from similarly-situated Caucasian persons, for reasons unrelated to credit risk.

103.     Defendants' discretionary pricing policies violate the Fair Housing Act and constitute actionable discrimination on the basis of race.

104.     Plaintiffs and the Class Members are aggrieved persons as defined in the Fair Housing Act by virtue of having been subjected to Defendants' discriminatory discretionary pricing policies.

## COUNT II:
## VIOLATIONS OF THE EQUAL CREDIT OPPORTUNITY ACT
### (15 U.S.C. §1691 et seq.)

105.     Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

106.     The Equal Credit Opportunity Act was first enacted in 1974 as a consumer protection statute prohibiting discrimination in the issuing of credit. The Equal Credit Opportunity Act has been broadly construed by the courts in order to protect consumers.

107.     Plaintiffs are applicants as defined in the Equal Credit Opportunity Act.

108.     Defendants are creditors as defined in the Equal Credit Opportunity Act and in the ordinary course of their business, participated in the decision of whether or not to extend credit to the Plaintiffs and all prospective members of the Class.

109.     Plaintiffs and Defendants engaged in a credit transaction as defined by the Equal Credit Opportunity Act.

110.     Defendants designed, disseminated, controlled, implemented and profited from the discriminatory policies and practices alleged herein, which have had a disparate economic impact on Minorities as compared to similarly situated Caucasians.

111.     All actions taken by Defendants' employees and brokers were in accordance with the specific authority granted to them by Defendants and were in furtherance of Defendants' policies and practices.

112.     As a result of Defendants' discretionary pricing policies, Defendants have collected more in finance charges and other fees from Minorities than from similarly situated Caucasian persons, for reasons totally unrelated to credit risk.

113.    Defendants' discretionary pricing policies are discriminatory and violate the Equal Credit Opportunity Act.

114.    Plaintiffs and prospective members of the Class are aggrieved persons as defined in the Equal Credit Opportunity Act by virtue of having been subjected to the discriminatory pricing policies of Defendant Washington Mutual or Defendant Long Beach Mortgage.

## COUNT III:
## VIOLATIONS OF THE CIVIL RIGHTS ACT: RACIAL DISCRIMINATION
### (42 U.S.C. §§ 1981, 1982 et seq.)

115.    Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

116.    The Civil Rights Act of 1866 and 1870, and later expanded in 1991, prohibits racial discrimination in the formation and issuance of contracts, and intentional interference to purchase and hold real property.

117.    Defendants intentionally discriminated against Plaintiffs and the Class Members by charging them higher interest rates than those charged to similarly-situated Caucasian mortgagees.

118.    By charging higher rates to the Plaintiffs and Class Members, Defendants unlawfully discriminated against them in the (i) formation of contracts, (ii) making, performance, modification, and termination of contracts, and/or (iii) the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship, and in their right to purchase and hold real property.

119.    Defendants' actions violate the Civil Rights Act. As a proximate result of Defendants' systematic violation of this statute, Plaintiffs and the Class Members are entitled to the requested relief provided thereunder.

### COUNT IV:
### UNJUST ENRICHMENT

120.    Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

121.    To the detriment of Plaintiffs and Class members, Washington Mutual has been, and continues to be unjustly enriched as a result of its discriminatory conduct.

122.    Upon information and belief, Washington Mutual's unfair, discriminatory operation of mortgage lending enabled it to unjustly collect millions of dollars from Plaintiffs and the Class.

123.    Accordingly, Plaintiffs and the Class seek full restitution and disgorgement of all such amounts, as well as other equitable relief as the Court may deem proper to remedy Defendants' unjust enrichment, including, without limitation, the establishment of a constructive trust from which Plaintiffs and the Class may seek restitution.

### PRAYER

WHEREFORE, Plaintiffs, on behalf of themselves the putative Class Members, pray for entry of judgment as follows:

A.    Certify this case as a class action and certify the named Plaintiffs herein to be an adequate Class representative and their counsel to be Class counsel;

B.    Enter a judgment, pursuant to 15 U.S.C. 1691e(c) and/or 42 U.S.C. § 3613, declaring the acts and practices of Defendants, complained of herein to be in violation of the Equal Credit Opportunity Act, the Fair Housing Act and the Civil Rights Act;

C.    Grant a permanent or final injunction, pursuant to 15 U.S.C. § 1691e(c) and/or 42 U.S.C. § 3613(c), enjoining Defendants, and Defendants' agents, employees, affiliates and subsidiaries from continuing to discriminate against Plaintiffs and the members of the Class because of their race through further use of any discretionary pricing policies or any non-risk-related discretionary pricing policy employed by Defendants;

820966.3

D.    Order Defendants, pursuant to 15 U.S.C. §1691e(c) and/or 42 U.S.C. § 3613(c), to adopt and enforce a policy that requires appropriate training of Defendant's employees, mortgage specialists and network of mortgage brokers to prevent discrimination;

E.    Order Defendants, pursuant to. 15 U.S.C. §1691e(c) and/or 42 U.S.C. § 3613(c), to monitor and/or audit the racial pattern of its financings to ensure the cessation of discriminatory effects in its home mortgage transactions;

F.    Order disgorgement, pursuant to 15 U.S.C. §1691e (c), of all disproportionate non-risk charges imposed on Minorities by Defendants' discretionary pricing policies; and order the equitable distribution of such charges, as restitutionary relief, to all appropriate Class Members;

G.    Order actual and punitive damages to the Plaintiffs and the Class pursuant to 42 U.S.C. §3613(c);

H.    Award Plaintiffs the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees, pursuant to 15 U.S.C. §1691e(d) and/or 42 U.S.C. §3613(c);

I.    Order the establishment of a constructive trust from which Plaintiffs and the Class may seek restitution; and

J.    Grant Plaintiffs and the Class such other and further relief as this Court finds necessary and proper.

## **JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury on all issues so triable.

Dated: February 1, 2008                    Respectfully submitted,

                                           **SCHIFFRIN BARROWAY TOPAZ &
                                           KESSLER, LLP**


                                           By:  /s/Edward W. Ciolko
                                                Joseph H. Meltzer
                                                Edward W. Ciolko
                                                Katherine B. Bornstein
                                                Joseph A. Weeden
                                                280 King of Prussia Road
                                                Radnor, PA 19087
                                                Telephone: (610) 667-7706
                                                Facsimile: (610) 667-7056

                                           *Attorney for Plaintiffs*

                                           **ROBERT D. ALLISON &
                                           ASSOCIATES**
                                           Robert D. Allison, I.D. # 36749
                                           Bruce C. Howard
                                           Steven P. Schneck
                                           122 S. Michigan Ave., Suite 1850
                                           Chicago, IL 60603
                                           Telephone: (312) 427-7600
                                           Facsimile: (312) 427-1850

                                           *Local Counsel*